UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

NICHOLAS FRANCIS,                         )
                                          )
          Plaintiff,                      )
                                          )
v.                                        )          No.: 1:19-CV-212-KAC-CHS
                                          )
GREGORY L. HUFF, ANDREW S.                )
PIERSON, LEIGH T. NOORBERGEN, and         )
CITY OF RED BANK, TENNESSEE               )
                                          )
          Defendants.                     )

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This case is before the Court on (1) "Defendant Gregory Huff's Motion for Summary Judgment" [Doc. 161], (2) the "Motion for Summary Judgment . . . " of Defendants Andrew S. Pierson and Leigh T. Noorbergen [Doc. 97], and (3) Defendant City of Red Bank's "Motion for Summary Judgment . . . " [Doc. 151].   For the reasons below, the Court **GRANTS** summary judgment to Defendants on all claims.

I.    **Background**

      a.  **Factual Background[1]**

"On the evening of July 23, 2018[,] Officer Gregory L. Huff, Jr. and Officer Andrew S. Pierson of the Red Bank, Tennessee Police Department were stopped in separate cruisers

---

[1] Because Plaintiff is the non-moving Party, the Court describes the facts in the light most favorable to him. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, where video evidence exists, the Court views the facts "in the light depicted by the videos." *Gordon v. Bierenga*, 20 F.4th 1077, 1079 (6th Cir 2021) (citations and quotations omitted). "If the facts shown on video can be interpreted in multiple ways or if the videos do not show all relevant facts," the Court "views those facts in the light most favorable to the non-moving party." *Id.* (citations omitted) (cleaned up).

observing traffic while positioned in the median of Highway 27 in Red Bank, Tennessee" [Doc. 170 at 2]. While on patrol, Officers Huff and Pierson were "'looking for criminal behavior'" [*See* Doc. 169 at 4 (quoting Doc. 151-1 at 3 (Deposition of Andrew S. Pierson ("Pierson Dep."), 40:14-16 ("Due to my training and experience in interdiction-style stops, we were just looking for criminal behavior"))); *see also* Doc. 179 at 1]. At or about 11:40 p.m., a dark colored Ford Focus was traveling along Highway 27 [Doc. 171 at 2]. Donna Allen ("Allen" or "the driver") drove the dark Ford Focus ("the Allen vehicle"), and Plaintiff, Nicholas Francis, sat in the front passenger seat [Doc. 168 at 3]. Allen and Plaintiff saw Defendant Huff and Defendant Pierson in their cruisers "sitting in the median" [Doc. 97-12 at 2 (Deposition of Nicholas Francis ("Francis Dep."), 23:22-23)].

Defendants Huff and Pierson pulled out of the median and followed the Allen vehicle, which Defendants Huff and Pierson believed to be acting suspiciously [Doc. 151-1 at 7 (Pierson Dep. at 49:9-10)]. The precise suspicious action by Allen that brought Defendants Huff and Pierson to follow the Allen vehicle is unclear,[2] but it is undisputed that Defendant Huff's "dash camera video showed most of the pursuit" that followed [Doc. 171 at 6]. The dash video camera in Defendant Huff's cruiser began recording at 11:37:52 p.m. [Doc. 1, Ex. C (Huff dash camera video)].[3] Defendant Huff's cruiser was initially diagonally behind the Allen vehicle, while the

---

[2] Defendant Pierson stated that he observed the Allen vehicle "beg[i]n to match [the] speed of the other vehicle [on the road], hiding itself behind the other vehicle, which would be an indication of criminal behavior" [Doc. 151-1 at 6 (Pierson Dep. at 46:13-18)]. Defendant Huff stated that he also had "a suspicion that [the Allen vehicle] was trying to conceal [itself], possibly committing a crime" and that "before" the Allen vehicle "passed" Defendants Huff and Pierson, the Allen vehicle "swerve[d]" [Doc. 161-4 at 5-6 (Deposition of Gregory Lynn Huff, Jr. ("Huff Dep.") at 59:9-10, 60:8-11)]. Defendant Huff also stated that due to "suspicious behavior, [he] chose to follow the vehicle to run the tag" [*Id.* at 8 (Huff Dep. at 63:1-2)].

[3] Plaintiff objects to the consideration of any video or audio recording of the events that have been enhanced by Defendants [*See e.g.*, Docs. 168 at 1-2, 170 at 1, 171 at 1]. Given Plaintiff's objection, the Court only considered the ***unenhanced recording*** submitted by Plaintiff at the time he filed

2

Allen vehicle traveled in the far-left lane [Docs. 1, Ex. C at 23:37:52; 179 at 2]. Defendant Huff's cruiser then moved to the left lane directly behind the Allen vehicle [Doc. 1, Ex. C at 23:38:09]. The Allen vehicle moved to the right lane and Defendant Huff's cruiser immediately followed [*Id.* at 23:38:16; Doc. 169 at 5 ("Driver puts on her turn signal to merge back to the right lane")]. At 11:38:21 p.m., Defendant Huff activated his "blue lights" and siren and the audio on the dash camera began recording [Docs. 169 at 5; 1, Ex. C. at 23:38:21]. Allen and Plaintiff "recognized that one of the officers was following the vehicle" because "[the officer] had the sirens on" [Doc. 97-12 at 2 (Francis Dep. at 23:16-17)].

Within seconds of Defendant Huff activating his lights and siren, the Allen vehicle accelerated [Doc. 1, Ex. C. at 23:38:27; *see also* Doc. 1, Ex. B at 0:10-8 (male voice states "be advised, they're not stopping, speed 90, possible 411")]. Defendant Huff "follow[ed] the [Allen vehicle] for approximately one minute with his blue lights activated" and then asked dispatch for a vehicle check [Docs. 169 at 5, 179 at 3, 167-1 at 16]. Defendant Huff learned "that the vehicle [wa]s registered to a 2002 white Ford," and he reported that the vehicle he was following did not match the vehicle registration [Docs. 169 at 5, 179 at 3; Doc. 1, Exs. B at 1:43-59, C at 23:41:42-59].[4] According to Plaintiff, "the cop got behind us [Allen and Plaintiff], started chasing us, and she [Allen] was weaving in and out" [Doc. 97-12 at 3 (Francis Dep. at 26:16-22)]. At some point,

---

his Complaint—Doc. 1, Exhibits B and C. Accordingly, any reference to recordings, both video and audio, in this Memorandum Opinion and Order are specifically to the ***unenhanced recordings*** that Plaintiff submitted.

[4] Plaintiff cites to the Computer Aided Dispatch ("CAD Report") time logs in support of the timeline of events in this case, and the Defendants have not generally disputed the exact timing of events. However, the Court notes that, at times, there are differences between when an event is logged in the CAD Report and when the event occurs according to Defendant Huff's dash camera recording [*E.g.*, *compare* Doc. 169 at 5 (citing CAD Report regarding registration of the Allen vehicle) *with* Doc. 1, Exs. B at 1:43-59, C at 23:41:42-59]. When the dash camera recording depicts an event clearly, the Court views the facts in the light depicted by the recording. *See Gordon*, 20 F.4th at 1079.

Plaintiff called his mother "screaming, telling her to call 911 because . . . [Allen] wouldn't pull over" [*Id.*].

Allen evaded capture for over seventeen (17) minutes, covering over twenty (20) miles, late at night, in the dark, at times traveling at high rates of speed [*See generally* Doc. 1, Exs. B at 0:10-8 & 1:10, C at 23:38:27-49:53; *see e.g.*, Docs. 167-1 at 16 (CAD Report comments regarding the speed and location of the Allen vehicle), 171 at 6]. Defendant Huff pursued the Allen vehicle in his police cruiser with his lights and siren on [*See* Doc. 1, Ex. C at 23:38:22-49:22; Doc. 161-4 at 14 (Huff Dep. at 72:7-8)]. During the pursuit, a female voice can be heard on Defendant Huff's dash camera audio making statements at regular intervals and confirming receipt of Defendant Huff's reports [*See generally* Doc. 1, Exs. B & C]. That voice belongs to Defendant Leigh T. Noorbergen, who was "the supervisor monitoring the pursuit" [*See* Doc. 151-3 at 2 (Deposition of Leigh T. Noorbergen ("Noorbergen Dep."), 27:15-16)].

Allen "travers[ed] Highway 27 until its juncture with Highway 111; taking Highway 111 North" [Doc. 171 at 6]. While on the highway, a pursuing officer reported on the radio that the Allen vehicle reached speeds of over 105 miles per hour [*see e.g.*, Doc. 1, Ex. B at 1:10], at times the vehicle maintained speeds of over 100 miles per hour [*See generally* Doc. 1, Ex. C at 23:40-50]. Allen changed lanes at various times and drove in the middle of the road, while maintaining speed [*See generally id.* at 23:40-52-41-05, 23:42-35-52, 23:43:05-20, 23:43:35-55, 23:44:10-46:15, 23:48:00-55]. She also drove on the shoulder of the road [*Id.* at 23:48:00-49:58]. Other vehicles on the highway moved to the shoulder or slowed down for safety as Allen approached and passed [*See e.g.*, *id.* at 23:43-46]. At approximately 11:50 p.m., the Allen vehicle left the highway and turned onto Jones Gap Road; Defendant Huff followed with his lights on and siren blaring [*Id.* at 23:49:53].

4

Jones Gap Road is a two lane road with one lane going each way, that has a number of curves and bends [*See generally id.* at 23:50:10-52:42]. After turning onto Jones Gap Road, Defendant Huff momentarily overtook Allen, but the Allen vehicle gained speed and moved back in front of Defendant Huff's cruiser [*Id.* at 23:50:00-59]. When the Allen vehicle merged back in front of Defendant Huff's cruiser, Allen left little space between the two vehicles [*See id.* at 23:50:26-30]. While on Jones Gap Road, Defendant Huff can be heard saying "be advised, passenger's got his hands up" [*Id.* at 23:51:14-18; *see also* Doc. 1, Ex. B at 5:50-52]. But Allen did not stop [*see generally* Doc. 1, Ex. C at 23:51:18-55:09]. Allen drove on the wrong side and in the middle of the two lane road [*Id.* at 23:50:20-43, 23:50:50-51:00, 23:51:20-52:24, 23:52:38-42]. As the pursuit continued on Jones Gap Road, the vehicles pass a number of mailboxes at varying distances as they enter a more residential area [*Id.* at 23:50:40-43, 23:51:00-23, 23:52:50-53:17, 23:53:41-54:34].

Ultimately, Jones Gap Road "turned into [Burchard] Road and became a dead-end" at a residential cul-de-sac [Doc. 171 at 6; *see also* Doc. 170 at 11]. When faced with a dead-end, Allen drove "up a concrete driveway; across the front law of a residence; and [] into the forest," [Doc. 171 at 6], "toward an opening in the trees," [Doc. 1, Ex. C at 23:55:09-11]. Defendant Huff, in his cruiser, followed the Allen vehicle into the dark wooded area [*Id.* at 23:55:11-45]. About thirty (30) seconds later, Defendant Huff's "cruiser became stuck between a grove of trees" [Doc. 170 at 11; Doc. 1, Exs. C at 23:55:45, B at 8:08].

Allen "continued driving through the woods," and Defendant Huff exited his cruiser and "pursued on foot" [Doc. 170 at 12; *see also* Doc. 1, Exs. C at 23:55:45-50, B at 8:09-11]. Defendant Huff ran toward the Allen vehicle [Doc. 1, Ex. C at 23:55:45-52]. Over the next twenty-

five (25) seconds, in the dark of the woods, minutes before midnight, the already dangerous situation took a turn for the worse[5] [*See id.* at 23:55:53-56:18].

Beginning at 11:55:53 p.m., it is difficult to see Defendant Huff on the dash camera recording, [*id.* at 23:55:53], but the camera captured the taillights of the Allen vehicle and continued to record audio. Defendant Huff could "see the Allen Vehicle struggling to drive up and over an embankment" [Doc. 170 at 12 (internal citations omitted)]. As Defendant Huff approached the Allen vehicle, it was still moving "but was having trouble gaining traction" [*Id.*]. Defendant "Huff could hear the engine revving and see the tires spinning as the car continued in motion" [*Id.*]. Defendant Huff approached the Allen vehicle giving "verbal commands," including "stop" [Doc. 155-2 at 20 (Huff Dep. at 115:15-17, 19-20); *see also* Doc. 170 at 12]. After giving "numerous commands," Defendant Huff used his baton to strike the driver's side window of the Allen vehicle [Doc, 155-2 at 21 (Huff Dep. at 116:24-25); *see also* Doc. 170 at 12]. Then Defendant Huff struck Allen in the "triceps area" [Doc. 161-4 at 36 (Huff Dep. at 125:2-19); *see also* Doc. 170 at 13].

Thereafter, Allen "looked directly" at Defendant Huff, "put the vehicle into gear" and then the Allen vehicle "went backwards and struck" Defendant Huff [Doc. 161-4 at 37 (Huff Dep. at 128:9-13); *see also* Doc. 1, Ex. C at 23:56:04].[6] After Allen struck Defendant Huff with the

---

[5] Plaintiff "recalls portions of the pursuit but has no memory of the time period between the time when Donna Allen drove into the woods and his removal from the vehicle minutes after the use of force" [Doc. 170 at 20].

[6] Plaintiff "dispute[s]" this fact but put forth no evidence to create a genuine dispute of material fact, as is required at summary judgment [Doc. 170 at 13]. *See* Fed. R. Civ. P. 56 (The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907 ("A genuine issue for trial exists only when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986))). There does, however, appear to be a material dispute of fact as to

6

vehicle, Defendant Huff "fell to the ground" on his back and "hit some trees that were behind" him [Doc. 161-4 at 37-38 (Huff Dep. at 128:24-129:6)].[7] Defendant Huff screamed [*Id.* at 38 (Huff Dep. at 129:17-18); Doc. 1, Ex. C at 23:56:11-13 (Defendant Huff's scream can be heard on the recording)]. At this time, Defendant Pierson (along with the light shining from his flashlight) is visible on the dash camera recording, running toward the Allen vehicle, which is still at a distance [Doc. 1, Ex. C at 23:56:03-05]. Defendant "Pierson heard Officer Huff cry out in pain" [Doc. 170 at 16]. Defendant Pierson, still carrying his flashlight, had covered approximately half the distance between the stalled Huff cruiser and the Allen vehicle [Doc. 1, Ex. C at 23:56:11].

Defendant Huff stood "alone in the dark wooded area when the headlights of the [Allen] vehicle again turned in his direction" [Doc. 170 at 16]. Defendant "Huff heard the engine revving and saw the wheels turning towards him" [*Id.*]. At 11:56:13 p.m., the taillights on the Allen vehicle turned red (no longer reversing), and the Allen vehicle began to move forward, in the direction of Defendant Huff [Doc. 1, Ex. C at 23:56:12-17].[8] Defendant "Huff fired successive rounds at one time from his gun into the vehicle" [Doc. 179 at 5; *see also* Doc. 1, Ex. C at 23:56:14 (shots firing)]. When Defendant Huff fired, he was standing facing the Allen vehicle, "positioned toward the front left panel of the Allen vehicle" [Doc. 170 at 20]. Defendant Pierson, as evidenced by his flashlight, was moving toward the Allen vehicle, still out of reach [Doc. 1, Ex. C at 23:56:13-15].

---

whether Allen subsequently ran Defendant Huff over with the vehicle after striking him [*See* Doc. 170 at 13-14].

[7] Plaintiff similarly "dispute[s]" these facts but put forth no evidence to create a genuine dispute of material fact [*See* Doc. 170 at 13].

[8] Plaintiff "dispute[s]" the fact that the Allen vehicle was "moving in Officer Huff's direction" "[a]t the time the shots were fired" [Doc. 168 at 12]. While the direction the Allen vehicle was moving is a material fact, the video recording contradicts Plaintiff's dispute [*See* Doc. 1, Ex. C at 23:56:12-17]. *See Gordon*, 20 F.4th at 1079 (viewing facts in the light depicted by the recording). Interestingly, while not instructive, the testimony of Plaintiff's own expert witness also contradicts Plaintiff's dispute [Doc. 161-3 at 5 (Deposition of Charles P. Stephenson, 155:11-14 (agreeing that the Allen vehicle was moving "in the general direction" of Defendant Huff))].

When the last of four successive rounds were fired, Defendant Pierson's flashlight can be seen hitting the ground, still at a distance from the Allen vehicle [Doc. 1, Ex. C at 23:56:17]. One round "entered Ms. Allen's chest resulting in her death"[9] and another traveled through Allen, entered Plaintiff and tragically resulted in Plaintiff's paralysis. [Doc. 171 at 10; *see also* Doc. 1, Ex. C at 23:56:13-18].

**b. Procedural Background**

Plaintiff filed suit under 42 U.S.C. § 1983. In his Complaint [Doc. 1], Plaintiff asserts ten (10) causes of action against four Defendants—Defendant Huff, Defendant Pierson, Defendant Noorbergen, and Defendant City of Red Bank, Tennessee—for violations of his rights under the Fourth and Fourteenth Amendments. *First*, Plaintiff alleges Defendant Huff, in his individual capacity, used excessive force in violation of the Fourth and Fourteenth Amendments, when he discharged his firearm at the Allen vehicle (Counts One and Two). *Second*, he alleges that Defendant Pierson, in his individual capacity, failed to intervene in Defendant Huff's discharge of his firearm, in violation of the Fourth and Fourteenth Amendments (Counts Three and Four). *Third*, Plaintiff asserts that Defendant Noorbergen, in her individual capacity, in violation of the Fourth and Fourteenth Amendments, "failed to terminate the vehicle pursuit," which led to the allegedly "excessive force" used by Defendant Huff [Doc. 1 at ¶¶ 91, 98] (Counts Five and Six). *Finally*, Plaintiff alleges that a policy and/or custom of Defendant City of Red Bank related to "vehicle pursuits" led to the shooting that occurred, and violated the Fourth and Fourteenth Amendments [Doc. 1 at ¶¶ 105-09, 113-18, 121-24, 129-131] (Counts Seven through Ten). Defendants moved for summary judgment as to all counts [*See* Docs. 161 (Defendant Huff's

---

[9] Plaintiff "objects to the admissibility of Allen's autopsy report pursuant to Fed. R. Civ. P. 56(c)(2) and Fed. R. Evid. 401 and 403" but does not dispute this fact "for purposes of summary judgment" [Doc. 171 at 10].

8

summary judgment motion), 97 (summary judgment motion of Defendants Pierson and Noorbergen), 151 (Defendant City of Red Bank's summary judgment motion). The motions are fully briefed.

## II. Legal Standards

### a. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden, the opposing party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56).

"A genuine issue for trial exists only when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'" *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907 (quoting *Anderson*, 477 U.S. at 249). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original) (quoting *Anderson*, 477 U.S. at 247-48). Where there is a video recording depicting the events in question and that "videotape quite clearly contradicts the version of the story told" by the non-moving party, the court views "the facts in the light depicted by the videotape." *Id.* at 376, 381. But "[i]f the facts shown on the video 'can be

9

interpreted in multiple ways or if [the] videos do not show all relevant facts,' [courts] view those facts in the light most favorable to the non-moving party." *Gordon*, 20 F.4th at 1079 (quoting *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017)).

### b. Applicable Section 1983 Law

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)). The Court thus "begins by identifying the specific constitutional right," or rights, Plaintiff alleges were violated. *Id.* at 394 (citations omitted). Here, Plaintiff alleges Defendants violated his Fourth Amendment right to be free "from unreasonable search and seizure" and his Fourteenth Amendment right to substantive "due process" [Doc. 1].

### 1. Use of Force

"A Fourth Amendment seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied." *Scott*, 550 U.S. at 381 (cleaned up) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 583, 596-97 (1989)). The Sixth Circuit has previously concluded that a law enforcement officer "by shooting at the driver of [a] moving car, . . . intended to stop the car, effectively seizing everyone inside, including the Plaintiff." *Fisher v. City of Memphis*, 234 F.3d 312, 318-19 (6th Cir. 2000) ("*Claybrook* [*v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000)] emphasized that police officers do seize any person who is a 'deliberate object of their exertion of force.'" (citing *Claybrook*, 99 F.3d at 359)).[10]

---

[10] The analysis and application of this rule is fact-specific. As the Court explained:

It is important to note the distinction in factual circumstances . . . to account for the different outcome here. . . . [I]n this case, Defendant fired directly at Ms. Becton's car in an attempt to stop the car and its passengers. Plaintiff

10

"The Fourth Amendment's prohibition against unreasonable seizures prohibits the use of excessive force against free citizens." *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014). "[W]hether an officer has used excessive force depends on 'the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Gordon*, 20 F.4th at 1082 (quoting *Graham*, 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and it "must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Scott v. Clay Cnty. Tenn.*, 205 F.3d 867, 877 (6th Cir. 2000) (quoting *Graham*, 490 U.S. at 396-97).

"In assessing deadly-force claims involving vehicular flight," the "critical question" is "whether the officer has 'reason to believe that the car presents an imminent danger' to 'officers and members of the public in the area." *Cass*, 770 F.3d at 375 (quoting *Smith v. Cupp*, 430 F.3d

---

was inside the moving car that was the object of defendant's intentionally applied force. This situation is also different from cases involving hostages, where an officer is attempting to shoot one individual (the fleeing felon) and avoid another (the hostage). *See, e.g.*, *Childress v. City of Arapaho*, 210 F.3d 1154, 1156–57 (10th Cir.2000) (finding, in hostage shooting case, no Fourth Amendment "seizure" because "[t]he officers intended to restrain the minivan and the fugitives, not [the hostages]"); *Medeiros v. O'Connell*, 150 F.3d 164, 167–68 (2d Cir.1998) (endorsing *Landol-Rivera*, and holding that where a hostage is struck by an errant bullet, the governing principle is that such consequences cannot form the basis for a Fourth Amendment violation); *Landol-Rivera*, 906 F.2d 791 (1st Cir.1990) (holding that a hostage injured when police fired at a suspect's getaway car was not "seized" for Fourth Amendment purposes). The officer here was not attempting to distinguish between Ms. Fisher and Ms. Becton. He was firing in an attempt to stop the vehicle.

*Fisher*, 234 F.3d at 318-19 n. 3.

11

766, 775 (6th Cir. 2005)). "An officer is justified in using deadly force against 'a driver who objectively appears ready to drive into an officer or bystander with his car.'" *Id.* (quoting *Hermiz v. City of Southfield*, 484 F. App'x 13, 16 (6th Cir. 2012)). Generally, "an officer may not use deadly force 'once the car moves away, leaving the officer . . . in a position of safety." *Id.* at 367 (quoting *Hermiz*, 484 F. App'x at 16). However, an officer may "continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when 'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'" *Id.* Courts "look both to whether anyone was in the car's immediate path at the time of the shooting and to the officer's prior interactions with the driver that show potential for 'imminent danger to other officers or members of the public in the area' if the driver is permitted to continue fleeing." *Gordon*, 20 F.4th at 1083 (quoting *Latits*, 878 F.3d at 549).

In contrast, a "substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment." *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (citing *Graham*, 490 U.S. at 396-97; *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)). A Fourteenth Amendment substantive due process violation occurs only where "conduct of a law enforcement officer towards a citizen . . . 'shocks the conscience.'" *Claybrook*, 199 F.3d at 359 (citing *Cnty. of Sacramento*, 523 U.S. at 846). "[I]n a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation . . . [, an officer's] reflexive actions 'shock the conscience' ***only if they involved force employed 'maliciously and sadistically for the very purpose of causing harm'*** rather than 'in a good faith effort to maintain or restore discipline.'" *Claybrook*, 199 F.3d at 359 (emphasis added) (quoting *Cnty. of Sacramento*, 523 U.S. at 853).

12

In distinguishing between application of the Fourth and Fourteenth Amendments in use of force cases, the Court assesses claims under the Fourteenth Amendment "if the plaintiff had been a non-target ***innocent third party*** collaterally injured by an assertion of official force." *Scott*, 205 F.3d at 876 (emphasis added) (quoting *Cnty. of Sacramento*, 523 U.S. at 841-855). But where the plaintiff was "a ***premeditated target*** of official compulsion designed to consummate a seizure," the Court assesses claims under the Fourth Amendment. *Id.* (emphasis in original). As discussed above, the Sixth Circuit previously concluded that "by shooting at the driver of [a] moving car," an officer "intended to stop the car, effectively seizing everyone inside." *Fisher*, 234 F.3d at 318-19. Here, because Plaintiff was a passenger in the Allen vehicle and the record regarding his precise status in the vehicle at the relevant time is murky, it is appropriate to follow *Fisher* and analyze Plaintiff's claims under the Fourth Amendment.

### 2. Failure to Intervene

A Plaintiff may also bring a Section 1983 excessive force claim against an officer who fails to intervene in another officer's unconstitutional use of force. Plaintiff "must prove that 'the officer observed or had reason to know that the excessive force would be or was being used and that the officer had both the opportunity and the means to prevent the harm from occurring.'" *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 872 (6th Cir. 2020) (quoting *Smith v. City of Troy, Ohio*, 874 F.3d 938, 945-46 (6th Cir. 2017)). To specifically establish a claim against a supervisor, plaintiff must show that "'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (quoting *Cardinal v. Metrish*, 564 F.3d 792, 802-03 (6th Cir. 2009)); *see also McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006).

### 3. Municipality Liability—Policy or Custom

A Plaintiff may also bring claims under Section 1983 against a municipality under *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). "[F]or a municipal entity to be liable [under Section 1983], a plaintiff must show: (1) a deprivation of a constitutional right; and (2) that the municipal entity is responsible for that deprivation." *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015) (internal citation omitted). However, a plaintiff "cannot prevail on a claim against the municipality" if he or she has not suffered a "constitutional injury."[11] *Cass*, 770 F.3d at 377. Plaintiff must then "connect the employee's conduct" that allegedly deprived plaintiff of a constitutional right to a specific "municipal 'policy' or 'custom.'" *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 408 (6th Cir. 2022) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)). At bottom, Plaintiff "must prove that the constitutional deprivation occurred ***as a result of*** an official custom or policy of the municipality." *Smith*, 874 F.3d at 946 (emphasis added) (citing *Monell*, 436 U.S. at 690).

### 4. Qualified Immunity

Where warranted, the doctrine of qualified immunity shields a law enforcement officer, sued in his or her individual capacity, from suit under Section 1983. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Under the familiar test for qualified immunity, a public official is immune from suit unless the plaintiff establishes: (1) a constitutional violation; and (2) that the right at issue was 'clearly established' when the event occurred." *Gordon*, 20 F.4th at 1082 (citation omitted);

---

[11] Under Sixth Circuit precedent, it may theoretically be possible for a municipality to be liable under Section 1983 where an individual other than a named defendant committed a constitutional violation. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 899-901 (6th Cir. 2018) ("[W]e need not decide whether, under our court's precedent, a municipality's liability under § 1983 is always contingent on a finding that an individual defendant is liable for having committed a constitutional violation"). But Plaintiff must undoubtedly suffer some constitutional injury for a municipality to be liable under Section 1983. *See Monell*, 436 U.S. at 691.

14

*see also Pearson*, 555 U.S. at 231. "If either [prong] is not satisfied, qualified immunity will shield the officer from civil damages." *Gordon*, 20 F.4th at 1082 (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

For the right at issue to be "'clearly established, existing precedent'" at the time of the alleged constitutional violation "'must have placed the statutory or constitutional question beyond debate.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). In the use of force context, where cases are often fact-specific, the Sixth Circuit has instructed that "[p]olice officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *See Gordon*, 20 F.4th at 1082 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (internal citation omitted)). Plaintiff must either "identify a case that put [the officer] on notice that his specific conduct was unlawful" or show that this is an "obvious case" where the prevailing standards "'clearly establish' the answer, even without a body of relevant caselaw." *Rivas-Villegas*, 142 S. Ct. at 8 (per curiam) (citations omitted).

## III.   Analysis

### a.   Plaintiff's Fourteenth Amendment Claims (Counts Two, Four, Six, Nine, and Ten)

As an initial matter, Plaintiff knowingly and voluntarily relinquished and abandoned his Fourteenth Amendment claims against all Defendants (Counts Two, Four, Six, Nine, and Ten). ***First***, in response to Defendant Huff's "Motion for Summary Judgment" [Doc. 161], Plaintiff asserts that his "Section 1983 claim against [Defendant] Huff is to be analyzed under the Fourth Amendment, not the Fourteenth" [Doc. 169 at 13]. And Plaintiff chose not to present any argument in opposition to Defendant Huff's motion for summary judgment as to Plaintiff's Fourteenth Amendment claim against Defendant Huff (Count Two) [*See* Doc. 169]. ***Second***, Plaintiff

15

similarly chose not to present any argument in opposition to the motion for summary judgment of Defendants Pierson and Noorbergen [Doc. 97] with respect to Plaintiff's Fourteenth Amendment claims against them (Counts Four and Six) [*See* Doc. 172]. And Plaintiff "incorporate[d] fully by reference . . . his response in opposition to the motion[] for summary judgment" by Defendant Huff, which included Plaintiff's statement voluntarily relinquishing and abandoning his Fourteenth Amendment claim [*See* Doc. 172 at 2 (citing Doc. 169)]. ***Finally***, in response to Defendant City of Red Bank's motion for summary judgment [Doc. 151], Plaintiff states that "the proper analysis is under the 4th Amendment, not the 14th Amendment" [Doc. 167 at 23]. And again Plaintiff chose not to present any argument in opposition to the City's motion for summary judgment [Doc. 151] with respect to Plaintiff's Fourteenth Amendment claims against Defendant City of Red Bank (Counts Nine and Ten) [*See* Doc. 167].

By knowingly and voluntarily relinquishing these claims and failing to address them, Plaintiff has abandoned them. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021); *see also Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (affirming district court's conclusion that plaintiff abandoned claims when she expressly declined or simply failed to address them in her response). Further, even if the Court were to consider these claims,[12] the Court's review of the record presents no genuine issue of material fact as to Plaintiff's Fourteenth Amendment claim against any Defendant. Accordingly, the Court **GRANTS** summary judgment to Defendants on each of Plaintiff's Fourteenth Amendment claims (Counts Two, Four, Six, Nine, and Ten).

---

[12] *See Briggs v. Univ. of Detroit-Mercy*, 611 F. App'x 865, 870-71 (6th Cir. 2015).

16

### b. Plaintiff's Fourth Amendment Claims (Counts One, Three, Five, Seven, and Eight)

#### 1. Defendant Huff (Count One)

Plaintiff alleges that Defendant Huff used excessive force when he discharged his firearm at the Allen vehicle and thereby seized Plaintiff in violation of the Fourth Amendment [*See* Doc. 1 at 14-15]. To the contrary, because it was objectively reasonable to believe that the Allen vehicle presented an "imminent danger" to Officer Huff, his use of force was reasonable and did not violate the Fourth Amendment. *See Cass*, 770 F.3d at 376-77; *see also Scott*, 205 F.3d at 878. Alternatively, even if Defendant Huff's actions violated the Fourth Amendment, he is entitled to qualified immunity because the right at issue was not "clearly established" on July 23, 2018. *See Scott*, 205 F.3d at 878; *Gordon*, 20 F.4th at 1083; *see also Latits*, 878 F.3d at 549.

At the time Defendant Huff discharged his firearm at the Allen Vehicle, Allen had evaded capture for over seventeen (17) minutes, fleeing in a vehicle that traveled at high speeds, failed to obey an officer's lights and siren, and drove erratically over the lines, in the middle of the road, and on the shoulder [*See generally* Doc. 1, Exs. B at 0:10-8 & 1:10, C at 23:38:27-49:53, 23:48:00-49:58; 23:40:52-41-05, 23:42:35-52, 23:43:05-20, 23:43:35-55, 23:44:10-46:15, 23:48:00-55; *see also* Docs. 167-1 at 16, 171 at 6]. It was objectively reasonable to believe that the Allen vehicle may have been stolen [*See* Docs. 169 at 5, 179 at 3; Doc. 1, Exs. B at 1:43-59, C at 23:41:42-59]. The Allen vehicle had driven off the road and entered the woods in the middle of the night in a residential area [Doc. 171 at 6; *see also* Doc. 170 at 11; Doc. 1, Ex. C. at 23:55:09-45]. Defendant Huff was pursuing the vehicle on foot. [Doc. 170 at 12]. In this rapidly evolving situation, the Allen vehicle had already struck Defendant Huff once moments before, causing him to fall to the ground [Doc. 161-4 at 37 (Huff Dep. at 128:9-13, 128:24-129:6; Doc. 1, Ex. C at 23:56:04]. When the headlights of the Allen vehicle turned toward Defendant Huff once again, the engine revved,

17

and the vehicle began to move forward,[13] it was objectively reasonable to believe that the Allen vehicle presented an "imminent danger" to Defendant Huff. *See Graham*, 490 U.S. at 396. In that split second, facing imminent danger, an officer need not retreat; "[a]n officer is justified in using deadly force against 'a driver who objectively appears ready to drive into an officer or bystander with his car.'" *Cass*, 770 F.3d at 375 (quoting *Hermiz*, 484 F. App'x at 16).

Like in *Cass v. City of Dayton*, "it was only after [Defendant Huff] himself had been hit" by the Allen vehicle, moments before, "that he attempted to stop the [vehicle] by shooting at the driver." *Id.* at 376. Defendant Huff, in the dark, on foot, facing a vehicle that had already hit him once, made a "split-second judgment" regarding the imminent danger presented by the Allen vehicle and the amount of force necessary "based on his understanding of the scene and his professional training." *See id.* The Court "must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). Because it was objectively reasonable to believe that the Allen vehicle presented an "imminent danger" to Defendant Huff, his use of force was reasonable and did not violate the Fourth Amendment. He is therefore entitled to summary judgment on this basis. *See Cass*, 770 F.3d at 375.

Alternatively, even if Defendant Huff's conduct had violated Plaintiff's Fourth Amendment rights, he is entitled to qualified immunity because "the right at issue" was not "'clearly established'" when he discharged his firearm on July 23, 2018. *See Gordon*, 20 F.4th at 1082 (quoting *Martin*, 712 F.3d at 957). A right is "clearly established" only when it is "'sufficiently clear that every reasonable official would have understood what he was doing

---

[13] Doc. 170 at 16; Doc. 1, Ex. C 23:56:14 (the engine of the Allen vehicle can be heard); 23:56:13 (lights of the Allen vehicle can be seen moving forward).

violates that right.'" *Rivas-Villegas*, 142 S. Ct. at 7 (per curiam) (quoting *Mullenix v. Luna*, 557 U.S. 7, 11 (2015) (per curiam)). The Court must consider "the specific facts of the case and their similarity to caselaw in existence at the time of the alleged violation." *Gordon*, 20 F.4th at 1082 (citations omitted). Specificity and similarity are "'especially important' in the Fourth Amendment excessive force context." *Id.* To overcome qualified immunity, Plaintiff had the burden to either "identify a case that put [the officer] on notice that his specific conduct was unlawful" or show that this is an "obvious case" where the prevailing standards "clearly establish the answer." *See Rivas-Villegas,* 142 S. Ct. at 8 (per curiam) (citations omitted). He failed to do so.

Plaintiff argues that *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017), governs this case and places the violation of his Fourth Amendment rights beyond doubt [Doc. 169 at 24]. But the facts of this case are distinguishable. In *Latits*, a four (4) minute vehicle pursuit ensued, after a driver produced his driver's license to an officer. *Latits*, 878 F.3d at 544-46. The driver "sp[u]n out" on the side of the road, then reversed in a continued attempt to flee. *Id*. at 546. The officer "could see that no one was in [the driver's] direct path." *Id.* at 546. Yet, the officer fired seven (7) bullets through the front of the reversing vehicle. *Id.* The Court concluded that the driver "did not objectively appear ready to drive into someone" when the officer shot him. *Id.* at 549. Further, the driver's conduct "never placed the public or the officers at imminent risk." *Id.* at 550.

In contrast, here, Defendant Huff was in the path of the Allen vehicle as it revved its engine and moved forward, placing Defendant Huff in imminent risk [Doc. 170 at 16]. The Allen vehicle had already struck Defendant Huff seconds before, evidencing an ability to endanger the officer again [Doc. 161-4 at 37 (Huff Dep. at 128:9-13)]. The facts of this case are simply not similar enough to *Latits* to "pass muster under the controlling standards for defining 'clearly established'

law." *Gordon*, 20 F.4th at 1085 (distinguishing *Latits*).  Nor is this the rare "obvious case" where prevailing Sixth Circuit standards "clearly establish the answer."  *See Rivas-Villegas*, 142 S. Ct. at 8 (per curiam) (citations omitted).  Accordingly, even if Defendant Huff's discharge of his firearm had violated the Fourth Amendment, he would be entitled to qualified immunity.  Accordingly, the Court **GRANTS** Defendant Huff's "Motion for Summary Judgment" [Doc. 161] as to Count One.

### 2.  Defendants Pierson and Noorbergen (Counts Three and Five)

Plaintiff's Fourth Amendment failure to intervene claims against Defendant Pierson and Defendant Noorbergen also fail.  ***First***, because Defendant Huff did not violate Plaintiff's Fourth Amendment rights by discharging his firearm, the "alleged complicity" of Defendants Pierson and Noorbergen[14] in Defendant Huff's "*lawful* use of [force]. . . could not offend the [P]laintiff's Fourth Amendment protections," so the claims fail as a matter of law.  *See Scott*, 205 F.3d at 878-79 (emphasis in original); *see also Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 410 (6th Cir. 2015) ("[B]ecause there is no underlying constitutional violation, [Defendant] may not be liable for failure to intervene.").[15]  ***Second***, even if Defendant Huff's discharge of his firearm had amounted to a Fourth Amendment violation, Plaintiffs claims against Defendants Pierson and Noorbergen would still fail because neither Defendant Pierson nor Defendant Noorbergen had an

---

[14] To the extent Plaintiff may have sought to pursue a Fourth Amendment claim of supervisory liability against Defendant Noorbergen simply because she supervised the pursuit of the Allen vehicle, rather than for her involvement in the actual use of force, such a claim would also fail to survive summary judgment because Plaintiff did not establish any Fourth Amendment violation [*See* Doc. 1 at 20, ¶ 101].  *See Bonner-Turner*, 627 F. App'x at 413.

[15] Plaintiff does not point to any separate conduct by Defendant Noorbergen that amounted to a Fourth Amendment violation.  He does argue, however, that Defendant Noorbergen failed to follow the City's vehicle pursuit policy [*See* Doc. 172 at 5-6].  But any failure to follow a policy—an issue that remains in dispute—does not alone equate to a constitutional violation.  *See Smith v. Freland*, 954 F.3d at 347-48 ("city policies do not determine constitutional law").

20

opportunity and means to intervene when Defendant Huff discharged his firearm and there is no evidence that Defendants Pierson or Noorbergen knew or had reason to know that Huff would discharge his firearm.[16] *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (A police officer may be held liable for failure to intervene during the application of excessive force when: "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the **officer had both the opportunity and the means to prevent the harm from occurring**." (emphasis added)).

Defendant Huff was responding to a rapidly evolving situation. The time between Defendant Huff's first physical interaction with the Allen vehicle in the woods—using his baton to hit the window—and the sound of the first shot fired was a mere nine (9) seconds [*See* Doc. 1, Ex. C at 23:53:05-14]. Defendant Pierson, who remained removed from the Allen vehicle and Defendant Huff, did not have an adequate opportunity or means to prevent Defendant Huff from discharging his firearm during those nine (9) seconds. *See Burges v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (concluding that the incident did not last long enough for defendant "to both perceive what was going on and intercede to stop it."). When Defendant Huff discharged his firearm, Defendant Pierson (running with his flashlight in hand) was still moving toward the Allen vehicle and Defendant Huff at a distance [Doc. 1, Ex. C at 23:56:14]. Standing at a distance, Defendant Pierson lacked an opportunity or means to prevent Defendant Huff from discharging

---

[16] To the extent Plaintiff intended to plead a Fourth Amendment claim against Defendants Pierson or Noorbergen for only their failure to terminate or intervene in the vehicle pursuit, separate from any connection to Defendant Huff's discharge of his firearm, he has not done so [Doc. 1 at ¶¶ 77, 78, 91]. And even if he could plead such a claim, it would not survive summary judgment here. *See Scott*, 205 F.3d at 878, n. 20 (Any "contention that the defendant officers somehow offended [Plaintiff's] constitutional privileges by allegedly initiating" or continuing "the high speed chase is facially misconceived, because [Plaintiff] had not been injured" during the car pursuit itself.); *see also Scott*, 550 U.S. at 386.

21

his firearm. *See Wright*, 962 F.3d at 872 (concluding that officers who were in closer proximity than Defendant Pierson was here did not have an opportunity to intervene). And Plaintiff has presented no evidence that Defendant Pierson knew or had reason to know that Defendant Huff would discharge his firearm at the Allen vehicle.

What is more, Plaintiff have presented no evidence that Defendant Noorbergen was even physically present in the woods when Defendant Huff discharged his firearm. So she would not, therefore, have had the opportunity and means to prevent Defendant Huff from discharging his firearm. *See Burges*, 735 F.3d at 476. There is also no evidence that she knew or had reason to know that Defendant Huff would discharge his firearm. While Defendant Noorbergen was "the supervisor monitoring the pursuit," [*see* Doc. 151-3 at 2 (Noorbergen Dep. at 27:15-16); *see also* Doc. 168 at 7], there is no evidence indicating that she "encouraged" Defendant Huff to discharge his firearm at the Allen vehicle or "directly participated in" the discharge of the firearm. *See Colvin*, 605 F.3d at 292. Accordingly, the Court **GRANTS** the "Motion for Summary Judgment . . . " of Defendants Andrew S. Pierson and Leigh T. Noorbergen [Doc. 97] as to Counts Three and Five [Doc. 1].

### 3. Defendant City of Red Bank (Counts Seven & Eight)

Plaintiff's Fourth Amendment claims against Defendant City of Red Bank also fail as a matter of law because there was no violation of Plaintiff's Fourth Amendment rights. *See Scott*, 205 F.3d at 879. As a threshold matter, to establish municipal liability under Section 1983 for a policy or custom, Plaintiff must prove that a "constitutional deprivation" occurred. *Smith*, 874 F.3d at 946. As discussed previously, Defendant Huff did not violate Plaintiff's rights under the Fourth Amendment by discharging his firearm. Nor did Plaintiff establish that any other Defendant violated Plaintiff's Fourth Amendment rights. Because Plaintiff failed to show a

constitutional injury, he cannot prevail on his Fourth Amendment municipal liability claims against Defendant City of Red Bank.  *See Cass*, 770 F.3d at 377 ("Because [deceased] was not deprived of a constitutional right, [Plaintiff (who is executor of decedent's estate)] cannot prevail on a claim against the municipality predicated on the same alleged constitutional injury" (citing *Scott*, 205 F.3d at 879)).  Accordingly, the Court **GRANTS** Defendant City of Red Bank's "Motion for Summary Judgment . . . " [Doc. 151] as to Counts Seven and Eight [Doc. 1].

## IV.   <u>Conclusion</u>

For the reasons set forth in this Memorandum Opinion and Order, the Court **GRANTS** (1) "Defendant Gregory Huff's Motion for Summary Judgment" [Doc. 161], (2) the "Motion for Summary Judgment . . . " of Defendants Andrew S. Pierson and Leigh T. Noorbergen [Doc. 97], and (3) Defendant City of Red Bank's "Motion for Summary Judgment . . . " [Doc. 151].  No claims remain in this action.  An appropriate judgment shall enter.

IT IS SO ORDERED.

KATHERINE A. CRYTZER
United States District Judge